Good morning, Marlo Koudetou for Comfort Gates. In this case, it's actually a relatively simple case, but it's one that is, even though it's deceptively simple, in some ways it's somewhat complicated. The charges here are conspiracy to commit health care fraud and three counts of substantive health care fraud. Whenever there's a health care fraud allegation, an essential element of that allegation is a material misrepresentation or a falsehood. In this case, we had an allegation in the indictment of a material misstatement or a falsehood, and that allegation was falsely representing that office visits and tests had been done and that they had been done at the Medic and Ulis clinics. Because the government specified the misrepresentation in the indictment, it was bound by it. That misrepresentation cannot be altered, it cannot be changed. If the government does change it, it constitutes a constructive amendment of the indictment, and that is per se reversible error. The purposes for the constructive amendment rule are really to ensure the right, the Fifth Amendment grand jury right, and also really it's a notice provision, a fundamental fairness requirement. The notice provision lets the defendant know that he's going to be, he or she, in this case she, will be defending against a particular allegation, and in this case a particular misrepresentation. All right, cutting to the core. Yes. I'm taking it that your premium argument is about constructive amendment. It is, Your Honor. As you know, we've got a sea of cases where constructive amendment has been raised. Most of them haven't made it, either because we've said A, it's within the range of the indictment, B, the jury got the indictment, the instruction directed, the judge said whatever else, this is what you do. So you know kind of the pathway. So the question is, cutting to the chase, given that backdrop, what in this case are you saying is outside kind of that heartland or the way that we look at these? Of course. Well, you know, this case, none of the cases that are out there are exactly like this case. Of course, no case is ever exactly like another case, but in this case we really do have, I think it's different for a couple of reasons. One, we have a ream, well, several reasons. We have a ream of evidence here. I mean the government, the entire . . . But in all these fraud cases, I'm not trying to cut off you, I'm trying to get the best use of your time here. But in all these fraud cases like this, there is a ton of evidence. I mean if they go to trial, there's a ton of evidence, yada, yada, yada. You know, it turns it away, it's charged. But the principle we get the constructive amendment claim, it is that, you know, you indicted this narrowly, you put proof in over here, basically you sent it to the jury. And in a couple of cases I've seen where we reversed, that's what we found. So I'm just trying to get to the core, not that if your argument is that the facts are from A to Zebra and we've got to look at the record and figure that out, okay, that's your argument, we have to look at it. But if you're telling me, well, in this case the jury instruction didn't direct the jury correctly, or something else that's nuanced about the way the case was tried, that's what I'm trying to cut to the core. But if you're saying you're making a fact-based argument, then we just have to read the record. But if you're saying there's something about the way this was tried that took it off the track, that's kind of where at least I need some help. Well, and I do, I mean, as the court can probably tell from the briefs, I do think there is a fact-based argument. I mean, the briefs are replete with examples of the government talking about this misrepresentation of credentials evidence. But in addition, what we have here that I think is a little bit different is that the government importuned the jury over and over and over and over again to convict on the material misrepresentation of credentials evidence. So the government is saying to the jury over and over, including in closing, if you find that the defendants misrepresented their credentials, then you can convict. But counsel, weren't the instructions clear about what the elements were of the crime charged and what proof was required in order to convict? Well, yes and no. The instructions actually were that the judge laid out the elements, did not give the instruction that was requested by the defense that would have clarified the use that could have been made of the material misrepresentation of credentials evidence. So there was a general listing of the elements, and then the court put in the language of the counts. But then there was this unanimity of theory instruction that was given as to the health care fraud counts. Normally we see those instructions given in a conspiracy case where you have multiple objects of a conspiracy, and of course you can prove multiple objects of a conspiracy. You can prove any one of those. In this case, that instruction was expressly not applied, to the conspiracy count. So the jury is being told, well, and that instruction isn't even appropriate, I would argue, in this case. The government citation talking about how, well, you can prove any object of a conspiracy, that applies to a conspiracy count. The court gave that instruction as to the health care fraud counts. And in those counts, we know from our case law that the material misrepresentation is an essential element. You can't take that material misrepresentation element and divide it into pieces and then say, well, you only have to prove part of the material misrepresentation. You're required to prove the entire material misrepresentation, not part of it. And that instruction applied only to the health care fraud counts, and the judge did not give it as to the conspiracy count. So if you're a juror and you hear this welter of misrepresentation of credentials evidence, and then the court gives an instruction that says, well, you can consider either part of this misrepresentation, not the credentials, but where you're seeing the patients and whether those tests are actually being performed, as long as you're unanimous as to both of those, then you can convict on health care fraud. And there's nothing in the instructions about what use to make of the material misrepresentation of credentials evidence. Then the jury is left thinking, well, the judge didn't tell me that that instruction applies as to the conspiracy count, and so therefore the government is telling me that I'm allowed to use this material misrepresentation evidence to convict on conspiracy. And then the court is telling me also in the Pinkerton instruction that if I convict on the conspiracy and I find somebody committed these health care fraud acts, who would be, of course, the cooperating witness, Ms. Agapian, then I can convict on all these counts. So that's essentially what happened here. We've got a case where there was this welter of evidence. So is it your position that the evidence on material misrepresentations about credentials was wholly irrelevant in this case? Well, I'm not sure that it's wholly irrelevant. There was some testimony about how, well, this is a part of the way that these false front clinics operate, but it became the entire case, and then the prosecution told the jury to convict on the basis of it, that you can convict on conspiracy if you find this representation, not the one that's charged. I see that was a very fast eight minutes. It goes in a hurry. Let me ask you this. You alluded to the trial judge's failure to give a requested instruction by the defendant in part of your argument. Is that failure to give the instruction an issue that you've raised on appeal? No. I mean, it's part and parcel of this constructive amendment argument. The failure to give the instruction, I mean, it's just that the instructions for constructive amendment, they as a whole are supposed to accurately reflect the law, and they do not. Well, I understand, but I get that. But as I said, in this heartland, when somebody's arguing that there's a constructive amendment, they say, you know, if the judge had given this instruction, the jury wouldn't have been derailed. Yes, the judge gave the Fifth Circuit pattern, but because of this uniqueness, here's the instruction. The judge didn't give it. We objected. That's on appeal independently, but as part of the core of your constructive amendment. Like I said, I tried to look. Not a whole lot of cases where we bounced on constructive amendments. I'm trying to figure if that failure to give instruction by the judge was so important and so integral to it, then I go query, why isn't that a part of the appeal? Other than it is intrinsic in your argument, I get that. But I just want to make sure that I hadn't missed something in terms of whether that proposed instruction independently or in addition to was a part of how the jury failed to do what it did. No, sir. It's a part and parcel of my constructive amendment argument and the failure of the instructions to accurately reflect the law and advise the jury. Is that proposed instruction? I mean, I guess other than just reading the raw record, is it, I guess in the old language, profit or some way otherwise evident for somebody to see? Well, yes. The defendant, Labiodon, who was acquitted, actually his counsel raised it and the other defendants adopted it. And there was a lot of discussion during the charge conference and I think during the argument about the Rule 29 about, Your Honor, this is really confusing to the jury. All the evidence relates to this other misrepresentation and so we would like you to advise the jury about the fact that the material misrepresentation is, in fact, this entirely different misrepresentation about where the tests were performed and that they were not performed. All right. Okay, thank you. You've reserved some rebuttal time. Thank you. Thank you. Buffmeyer. Good morning, Your Honors. May it please the Court, Edwin Buffmeyer on behalf of Godwin Umatong. Your Honors, as you know, Mr. Umatong joins in the constructive amendment argument. I plan to focus on Mr. Umatong's sufficiency of the evidence argument in motion for new trial and plan to rest on the briefs on the overt act instruction. Mr. Umatong's appeal is about the disconnect between the government's evidence against him on the one hand and the requirement that they prove his knowledge of fraudulent billing to Medicare on the other. There are really three pieces of evidence that I think we can all agree upon that the government rests its case against Mr. Umatong. First, there was testimony of him ordering tests. Second, there was the evidence about his lack of U.S. medical credentials. And third, the testimony by Joanna Gopian about the specific ultrasound test that she ordered. Now, the district court, in hearing all this evidence Did he testify on his own behalf? Excuse me, Your Honor? Did he testify on his own behalf? No, Your Honor. Mr. Umatong did not take the stand. Now, the district court, in weighing this evidence, noted that the evidence against him was thin. More accurately, Your Honor, this evidence was insufficient. This court held in Willett that there's insufficient evidence of a conspiracy where the government merely stacks inference upon inference upon which it rests its conspiracy charge. And that's exactly what happened here with these three pieces of evidence. First, on the testimony about ordering tests, there's no connection between the fact that Mr. Umatong went out, took patient information, and brought that information back to the clinic for further review by either a PA or a doctor to authorize the tests, that there was testimony either he or someone else recommended by checking boxes. There's no connection between that and then billing Medicare. The testimony is consistent that Ms. Gopian did that on her own. In connection with the ordering test, he'd fill out a form indicating what test he was ordering. Is that right? Well, Your Honor. Did he do that, Mr. Umatong? Mr. Umatong, what the evidence shows is that he got the patient information and dropped that information off at the office to one of the office assistants. He took vital information, recorded the patient's complaints, and in the forms that were admitted into evidence, none of which were connected to Ms. Umatong, there were check marks for recommended tests that were then to be further reviewed by a doctor or a physician to actually order the tests or that they were performed. You're saying it wasn't anything he recommended? Well, Your Honor, there were check boxes and there was testimony that he recommended certain tests be performed, yes. Then he didn't sign the form because he wasn't authorized to sign any form. Yes, Your Honor. I think that's exactly right, but I also think that that goes against the government's case against Mr. Umatong because he didn't sign the form because it was for further review by a doctor who then submitted the form either to Ms. Gopian for actually ordering the tests or was responsible for following up. There's no evidence Mr. Umatong was to perform those tests. And so the lack of signature at the bottom, it was for the licensed physician assistant or doctor to sign those forms. He was merely making recommendations to the extent the evidence shows that. And I think, to your point, there's a telling reference in the government's closing argument about Despy Kanay, the licensed physician assistant, who you'll recall came in sometime after Mr. Umatong was there. The government says in its closing argument that Mr. Kanay signed the forms because he was licensed to do so. He signed the same forms that Mr. Umatong had filled out, had the same information in front of him, and was a step further in the process. And the government said that the reason he's not sitting over there, the reason he remained unindicted, was because he actually had a license. So the reason he was unindicted was because he lacked a license, but he had the same forms, the same orders, and the same recommendations in front of him, but was only one step further in the process. That just goes to show that these forms really had nothing to do with the billing of Medicare that the government was required to prove beyond a reasonable doubt. It also goes to show that the lack of medical credentials doesn't really get the government where it needs to go in this case to prove the object of this conspiracy, to prove, excuse me, that Mr. Umatong had knowledge of and an intent to join the object of this specific conspiracy, billing Medicare for services that went unperformed. I think the court's language from Bieganowski, which was also a constructive amendment case, but dealt with sufficiency, the court said that in as much as the circumstantial evidence tends to prove the defendant knew clinics were involved in the fraudulent billing practices, there was sufficient evidence to establish participation. In that case, there was direct evidence of the Medicare billing regulations being in possession of the defendants, that they possessed the guidelines, knew what was being billed out, knew the profits and the benefit that would confer to them by misrepresenting what services had been performed. That evidence is wholly lacking in this case. There's a major gulf between lacking medical credentials and the multiple inferential steps you have to take in order to prove knowledge of the object of this conspiracy and knowledge of the billing that was submitted to Medicare by Joanna Gopian. And lastly, the third piece of evidence that the government arrests this case against Mr. Umutong is Ms. Gopian's testimony about this ultrasound, where she said that he ordered Mr. Umutong, the only example where she said that she ordered Mr. Umutong to actually perform a test, Mr. Umutong said that he had performed it, and Ms. Gopian complained that she never got the results back. Well, first of all, this evidence is wholly separate and doesn't go to the indictment because it's evidence that he actually did perform the test and it's one that he was licensed to perform. You said he claimed that he performed it. That was Ms. Gopian's testimony that Mr. Umutong said he performed the ultrasound, but she said she never got a copy of the results back. So the evidence is that he did perform it, that he had a license to perform it, so it's wholly separate from the indicted charge in this case. But lastly, the ultrasound is really a red herring because if Ms. Gopian required test results in order to further her fraud against Medicare, if she required a copy of the test results to further her fraud against Medicare and Mr. Umutong didn't provide the test results, that just goes to show he didn't know what Ms. Gopian was doing with them and didn't know the importance of providing those test results and so had no knowledge of the fraudulent billings to Medicare. And I guess, counsel, everything you're saying to me now sounds like a great closing argument, which I'm assuming the jury had a chance to hear. The jury heard this evidence, yes, Your Honor, but at the end of the day, this court has held, even on review, even under the deferential standard of review, where the government is entitled to all reasonable inferences, there's still insufficient evidence to convict on a conspiracy where there are just inference upon inference upon inference. Further, Mr. Umutong made a motion for a new trial where the standard is whether the evidence preponderates so heavily against the verdict that a miscarriage of justice was evident from the evidence. Here, that disconnect between the evidence against Mr. Umutong and the charged crime shows that there simply wasn't enough evidence to prove. Didn't the jury acquit one of these defendants? Yes, Your Honor. Oh, isn't that indicative? They sorted it all out. They heard it all. They sorted it out. You know, when they thought they knew it, they cut them loose as opposed to buying a whole hog, whatever the government was arguing. Yes, Your Honor. I see that I'm out of time. If you'd like me to . . . You're never out of time to answer our question. Counsel, you have unlimited time to answer. Well, to answer the question, it's probably not a question that's a little rhetorical, but my only point was that, not for you to embrace it, but unlike a lot of these cases where everybody's convicted, in this case you allow one of the defendants wasn't acquitted, which presumably, as Judge Graves alluded, the jury had all this evidence to sort out, et cetera, and in this case acquitted someone. But your argument still is that your claim basically was remote from this operation, so remote that the evidence there just doesn't get to the point of beyond reasonable doubt. I mean, at the core, is that what you are? Yes, Your Honor. And that there simply isn't a connection between him and the fraudulent billing. In this court's health care fraud cases, there's overwhelming examples of evidence that the individual was aware and had connection to the billings. And to your point about the jury's verdict as to one of the co-defendants in this case, I think that only goes to the fact that the evidence against these individuals who were actually tried was extremely thin, as the district court noted, and such that it was insufficient to support the verdict. And at the very least, Mr. Mouton was entitled to a new trial. All right. Thank you, sir. Thank you. All right. We'll hear from the governor. Ms. Falconer? Did you try the case? Did you try the case? Were you the trial lawyer? Okay. Good morning, and may it please the Court. Emily Faulkner for the United States. I just wanted to let Your Honors know that I'm hearing impaired, and I do have a court reporter who's helping me with the captions here. So if I appear to be looking over here, that's fine. We're well aware, as long as you keep your voice up so we can hear. I'll do my best. If I could make only one point to the Court today, it would be that the evidence that the defendants lied about their medical credentials was not some unrelated auxiliary piece of evidence unrelated to the crime charge. It was important to the crime the defendants were charged with for a number of reasons. First, the jury heard a great deal of testimony about the nature of a false front Medicare fraud scheme. The defendants going into the Medicare beneficiaries' homes, lying about being doctors, was integral to the functioning of the scheme because, one, it allowed them to get the Medicare beneficiaries' numbers in the first instance and also to get their signatures in those patient files. In that, we heard testimony from the case agents. The jury heard testimony from the case agent that— Were they doctors anywhere? Was he a doctor anywhere? Was he a doctor in another country? Yes, Mr. Umatong and Ms. Gates were medical doctors in their home countries, but they were unlicensed in the United States, and the jury heard a great deal of testimony that a doctor in another country without passing licensing exams is, for all intents and purposes, just like you or I in the United States. I mean, they have some medical training. What was the other country? Where were they authorized to practice? I believe they were both from Nigeria, Your Honor. I would have to double-check that. I believe—I think Umatong was from Nigeria. I'm pretty sure Gates. I would have to double-check on her. But if a doctor from the United States travels to another country, you wouldn't expect that people would stop calling her doctor, would you? Well, Your Honor, I mean, she would not be able to go into people's homes in another country. Practicing without a license in that country is one thing, but just having someone call you doctor in another country, there's nothing wrong with that, is there? Well, I don't think there's anything wrong with introducing oneself in social conversation as a doctor, but it's quite different than going into a medical office, seeing a patient, and saying that she's a doctor, and saying, I'm a doctor and I'm here to treat you. It's quite a different thing in the United States. That is, in and of itself, illegal, but of course that's not the point. The point is that— Well, I mean, I thought part of the testimony was that they just— they were calling each other doctor when they went out to see these patients. Yes, the patients were also told that they were doctors, and that's the important part. The front office staff— Well, they are a doctor. They're just not a doctor licensed to practice in the United States, right? There was testimony from Medicare's oversight contractor, Scott Ward, at trial, that as far as Medicare is concerned, they're not doctors. They're not licensed. They have no capability to perform these services. Now, and I think, Your Honor, I mean, I think what you're getting at is I think there may be two separate ways to sort of— that evidence is susceptible to a couple of different inferences. I mean, one way that we could look at it is that they're just calling each other doctor. It's kind of a social thing. The other is that they're out there seeing that they're doctors. Joanna Gopian testified that they actually went out and bought lab coats. They did a lot of things to make themselves appear to be doctors. Now, the inference on this sort of standard of review that we have to draw is that they were doing that to create the illusion of legitimacy, to create the illusion that they were, in fact, there to perform medical services, which they were not licensed to provide, and which ample evidence showed that they were not providing in the first instance. I mean, it's not just that they were unlicensed providers, you know, providing some kind of medical services. The testimony overwhelmingly showed that not only were these tests not performed, but no proper physical exams— If you had—if you—neither of these men—assume they're men— had represented that they were doctors and had said nothing else, how strong a case would you have had? Well, Your Honor, in this case— I mean, is that what you're really relying on is the fact that they call themselves doctors or the fact that they were not doctors? Or where's the fraud here? No, Your Honor. It's a combination of two things. It's a combination of the fact that they were billing Medicare for tests and services that were never performed. They were billing all of these patient encounters as office visits. So it's a combination of these bills being submitted. You're talking about conspiracy now? Did they themselves bill it or did whoever was running that show bill it? Your Honor, the bills were directly submitted by a third-party agency. That was the testimony of Melvin Smith. He was the third party that they used to submit those bills. But Melvin Smith, what he submitted to Medicare was determined by what was in a document called a super bill. Now, this came from the testimony of Joanne Agopian, who was kind of at the top of this pyramid. And Agopian testified that these fake physicians, these fake PAs, were the ones that filled out that super bill. They checked those boxes to say this test was performed. What if they had not represented themselves as doctors? Could they have filled this out? I mean, were they permitted to fill it out? No, Your Honor. They could not fill out a super bill. I don't— So you're saying the fact that they held themselves out as doctors was essential to the fraud itself? No, Your Honor. The fraud was that they were billing for services that were not performed. The fact that they held themselves out as doctors— So, no, if they had not lied about being doctors, if they had just gone in and said, Hi, I'm Mr. Umetong, I'm Ms. Gates, and done what they did, they would absolutely could still—that would still be illegal that they billed Medicare for services and tests never performed. Now, the fact that they— So that is the offense. Is that correct? That's the offense, yes. That's the offense, not that they held themselves out. No, Your Honor. The fact that they held themselves out as doctors served a couple of purposes. That evidence served a couple of purposes. One is to show that they knew— Why do you say that that is so relevant to proving the crime with which they were charged? Because it shows, Your Honor, that they knew, that they were aware. The defense that they put forth at trial was, Look, we're just these innocent folks who have—we were doctors in our own countries. We had no idea what we were doing. That was a defense theory. That's what was argued to the jury. The fact that they lied about being doctors— When you say that your constant representation to the jury that these were holding themselves out as doctors was a form of response to their defense? Your Honor, I think the government, if I'm understanding the question, I think the government placed that evidence about the misrepresentations in proper context when it spoke to the jury. The government did reference that evidence on multiple occasions. It was a big part of the testimony at trial. But I think the government placed it into proper context on a number of different occasions in closing argument. The government said, I think, on four separate occasions in opening and closing arguments, exactly what I'm saying now, which is that the lying about credentials was part of the way that the conspirators created a veneer of legitimacy. It's part of the way that they put together this scheme in hopes of avoiding detection by Medicare. And on four separate occasions in argument, the government made that exact point to the jury. The government also told the jury on two separate occasions that this was evidence that they knew of the conspiracy's purpose, that they had that guilty knowledge. You're trying to show through that their knowledge and willful participation in the conspiracy? Was that what the government argued? In other words, this credentials was probative of their awareness, their knowledge, other capacity, and active participation? Was that what the government argued? Correct, Your Honor. That is what the government argued on a number of occasions. The government argued a few separate ways in which this evidence was relevant, and that's correct. It was relevant in a few different ways, but the government not specifically did argue. The key passage from closing argument is pages 1922 to 1923 of the record. That's where the trial prosecutor talked at great length about the knowledge element and the fact that the defendant's case really rested on the lack of knowledge. And at that point, he did place that evidence in its proper context. And then also, yes, Your Honor, the kind of agreement and assent to the conspiracy's purpose as well. You mentioned about the super bills, I think is what you alluded to. So were those documents that were what filled out in the field, so to speak, that's some paperwork that's filled out while a person is out with a patient or whatever and then turned in? Is that? It's not clear from the record whether they were actually filled out in the field or back at the office. It was one of the pieces of paperwork that the jury, I mean, that the jury heard that the physician's assistants, that the fake doctors did fill out. I'm not sure whether they filled it out in the field or once they got back. Well, my question probably wasn't asked clearly, wasn't so much whether it was in the field. But, I mean, is there a clear link in the evidence, in the testimony, that those documents were, in fact, filled out or provided by the defendants here, as opposed to anybody could have filled them out? That's what I'm trying to . . . That's linked into the fraud. So I'm trying to say was there a link, a nexus made between them filling it out as opposed to, you know, their handwriting or some other witness who clearly put them as the ones who provided them, whenever and wherever it was provided. Do you understand my question? Yes. Yes, Your Honor. No, there was no testimony that linked any particular super bills to these exact defendants. There was testimony from Joanne Agopian, the ringleader of the conspiracy, that the physician's assistants themselves were the ones that filled out those forms. Does that answer the question you're asking? The question, can you list for me the evidence that you have that tied these two defendants to the conspiracy? One, two, three, four. What do you have in terms of incriminating evidence against these two defendants as part of the conspiracy? Yes, Your Honor. I would just note at the outset that Defendant Gates has not challenged the sufficiency of the evidence to support her conviction. That's entirely unchallenged in her case. She's only standing on her constructive amendment claim. So I actually have not—we haven't briefed or really analyzed the issue related to her. I do believe that the evidence against her is even stronger than against Mr. Umetong, but I just don't have that ready for her—for Mr. Umetong. At a high level, of course, we can infer his assent to the conspiracy's purpose, and this Court has said as much, from the fact that he himself took acts that furthered the conspiracy's purpose. Now, first and foremost, that's him— He's got to knowingly do that. He does. He's got to knowingly join the conspiracy and knowingly perform those acts. That's true. That's true, and that knowledge can be inferred from the circumstances. Him lying about his credentials, going into patients' homes, we can absolutely—and this is what Judge Garvey concluded— That doesn't seem to—I mean, he could lie about his credentials, and that would not necessarily mean that he's part of the conspiracy, or if he goes into the people's homes. I mean, that's not part of the conspiracy because he was apparently entitled to go in there. I mean, the only evidence, as I understand, you told me, the essence of your case, is the false reporting for services that were not performed. That's true, Your Honor. Did they do that, or did he do that? He, Your Honor, he—first of all, I mean, I would just go back to the question of the knowledge point. I mean, I think we have to draw the inference. If that evidence that he lied about his credentials supports an inference that he knew about the conspiracy's purpose, as the government argued at trial, we have to, at this phase, draw that inference in favor of the verdict, just as the jury did. And, yes, there is evidence that he himself was personally involved with the ordering of tests. Now, his co-conspirator, Leslie O. McBemmey, testified in so many words—this is page 800 of the record— that he personally saw Godwin-Umatong order tests that were never performed. We have Joanna Gopian's testimony that the way that this scheme worked was that these fake physicians, fake physician's assistants, would go out into the patient's home in pairs. One of them would pose as a doctor or PA, and one of them would pose as some kind of a technician who would be performing some kind of test. Now, in the case of— That's not what you say is the essence of the crime. Well, ultimately, the crime is that they go into this patient's home, they masquerade as doctors, they get the patients to sign the file. And this is what the government argued to the jury at trial and to the district court, that the crime does not begin and end with the submission of a fraudulent bill to Medicare. This crime starts much sooner, and it starts with the process of going into these patients' homes, misrepresenting who they were, pretending to perform some kind of service that was never actually performed, some kind of rudimentary physical examination, when in the office there was testimony that they didn't even have the proper equipment to perform a proper physical exam. They certainly never performed any tests. There was reams of testimony that no tests were ever performed, if maybe a few, if any, but almost no tests. They did claim and filed with Medicare charges for tests? Yes, Your Honor. Both tests and— And they never performed a test? And the tests were never performed. And did they know that those charges were filed? They turned in those charges as though they had filed, as though they had performed a test? Your Honor, I think we have to make the inference that they knew that those— No, we don't have any, obviously, we don't have a document in which they wrote down and sent an email to someone else, I know these tests weren't performed. I think we have to infer that they knew because they were at the front line of ordering these tests. Additionally, when they would go out to the patients' homes, the clinic actually owned some kind of machine, some test machines that could be, in theory, used to perform these tests. They didn't even work.  Over what period of time, or how long, did Mr. Umatom work with these two clinics? A little under a year. All right. A little under a year. And so I wanted to kind of circle back— And over the course of that period of time, how often was he going out to do these visits with the patients and filling out these forms? Once a week? Three times a week? Every day? Your Honor, I'd have to double-check that exact—I don't know that exact— but it was certainly multiple times a week, multiple patients a day, multiple times a week, and I don't know that— For almost a year. I'm sorry, can you say that again? For almost a year. For almost a year. All right. For almost a year. And I do want to—on that note, Your Honor, I do want to circle back to the point about the defendant that was acquitted, Defendant Libayudin. I think the fact that he was acquitted shows us a couple of important things. As you mentioned, Your Honor, I think it shows that the jury was able to follow and parse out his instructions. Libayudin was only involved with the conspiracy for maybe a month or two at the most, and it seems as though that fact was important to the jury's determination, that just these guys, Umatong and Gates, these folks who were there for— Umatong, I think, was just under a year. Gates was there about a year. That certainly, by that point, that ongoing engagement shows, and this court's case also supports this, that that kind of ongoing engagement shows—allows an inference of their sort of active participation in the conspiracy. One other point about that acquittal, if the jury had believed that it could convict solely for the basis of the misrepresentation of medical credentials, then I think it would have convicted Libayudin, who also lied about his medical credentials. We have that same testimony that Libayudin went out, he said he was Dr. Tolu, he was practicing outside the scope of his license. We have all that same evidence for him, and the jury still acquitted him. So that is very strong evidence from this record, even outside of the fact that the jury was properly instructed, that this jury followed its instructions, that it could convict only as charged in the indictment. So does—Gopian is the one who testified, right? Correct. Was the charge co-conspirator? She was. She was charged as a co-conspirator. She was the ringleader, I guess, or— Yes. So is her testimony the key tie to what Umutang and the other defendant did and when they know what it means? The jury's assessment of her credibility, is that a key piece of your ability to convict Mr. Umutang in particular? Yes. I mean, I think the jury had to find her credibility, find her credible in order to give it. I mean, there was testimony from other co-conspirators, but she really did kind of have a knowledge from the top down of kind of how things worked. But one of the things that Mr. Umutang is urging, I think, in this appeal on sufficiency, is that she wasn't credible. And that's just simply not an assessment— Was he convicted only on conspiracy or the other substantive counts as well? He was convicted on conspiracy and then on the substantive counts under Pinkerton liability. So he was found guilty of all charges? Correct. Substantive and conspiracy. And was he sentenced on the substantive charges? Or how did that work? I mean, the sentence, did he—was he given a primary sentence and then given a concurrent sentence with all the substantive charges? You know, Your Honor, since this isn't a sentencing appeal, I would have to go back and double-check the record on that. I don't have a full facility with the sentencing facts at this point. So, I mean, even if we acquitted him on the conspiracy charge, that's the only one he appeals now, is that correct? Well, because the substantive counts—I think I know you were going to say, Your Honor—because the substantive counts rested on Pinkerton liability, the substantive counts were not tied to any particular defendant. They were convicted of conspiracy and then liable for the substantive counts just kind of as actors in the conspiracy. So if the court were to reverse on the conspiracy count, then the substantive counts would also, as a natural result, fall as well. You know, I just wanted to take a moment. I guess I don't—I'm almost out of time. So if the Court has no more questions, I would thank you and just urge you to please affirm Judge Goffey's conviction. Thank you. All right. Thank you. Ms. Calhoun. Yes, Your Honor. I just would like to respond—sorry about that bang. I'd like to respond to a couple of points that the government made. First, the government contends that these defendants were unlicensed. I should tell the Court it's Mrs. Gates, Comfort Gates, not two men. Mrs. Gates is licensed in Nigeria as a physician. There was testimony at trial, and it's undisputed that she was a licensed medical assistant in the United States. She also had—there was testimony, and it was undisputed that she had and was studying for the medical examinations to become licensed in the United States as a physician and had passed the first of those two exams. So it's not true to say that she was unlicensed. I also wanted to point out that the government was contending that Ms. Gates had filled out these super bills that claimed on the super bills themselves that the tests were actually rendered. That is not an accurate statement of the facts of this case. Actually, the defendants who went out in the field filled out a form that reflected the physical examination that they did, and, of course, Ms. Gates actually is a medical professional in Nigeria. She's a physician, so presumably her exam is not a rudimentary exam. She actually knows what she's doing. There's no allegation that patients received poor care from her because she was incompetent. So they would perform these exams and then would fill out a form that recommended tests. The tests were to be performed by someone else. In Ms. Gates' case, certainly the tests were to be performed by someone else. There were recommendations for tests, and a physician was required to sign off on those forms. She never signed the forms as the physician who was authorizing those tests or as the person who was performing them. In addition, what the government is arguing here, and you hear it. I mean, the argument here today is really similar to the argument that was at trial, that the jury heard at trial, and that is we keep hearing about this misrepresentation of credentials, but the reality is that it's really an improper inference. It's like a 404B inference. She lied about credentials, so therefore she must have known about the conspiracy, and it just does not follow. Unless the Court has further questions. Thank you. Thank you.  First on the length of time that Mr. Umaton was with the company. Not to quibble with generalizations of the length of time, but the testimony varied slightly between whether it was six or seven months, sometime in the period of August to February, whether that means nearly a year or not, but it was certainly sometimes shorter than a year. And then also to the point about the Pinkerton liability, Mr. Umaton has challenged this conspiracy conviction. As the government noted, that the substantive counts were all based upon the conviction on the conspiracy under Pinkerton liability, and so the substantive counts would fall, too. There was no connection, both the government and the district court noted, there was no connection between Mr. Umaton and the specific substantive counts in the indictment. But I think Judge Jolly's questions really get to the point of why Mr. Umaton is entitled to an acquittal, or at the very least a new trial, because the government led the jury astray in the conviction here, and that's even with the testimony that there was some form of ordering tests that were ultimately never performed, that doesn't go to show knowledge that those tests were never going to be performed. And the government's argument that, well, you have to infer that he knew they would never be performed, okay, well, if you take that inference, you still have to infer on top of that that he knew that there would be. What was his position? He was just an innocent bystander who just happened to be in the neighborhood? And I don't mean to be facetious by the question, but I'm saying what was his defense in terms of his remoteness from all of this, such that the jury could not have inferred, you know, any culpability? I mean, just in a nutshell, I mean, what? Well, Your Honor, Leslie Omagbami and Munda Masakoi and even Dr. Segovia, the licensed doctor who worked at the clinic, all testified that Ms. Agopian handled billing and everything else separately. These individuals who were going and taking patient information and merely making recommendations to doctors had no idea what Ms. Agopian was billing Medicare for. They had no knowledge that tests were never to be performed, nor no knowledge that Medicare was being billed. I mean, doesn't that be direct? I mean, in other words, they could infer from, like, a year's association with these people who engage in anything. I mean, would indicate to a reasonable person some basis for knowledge of what was going on. I mean, they couldn't just stand. It's not like they came in one day and just spent one day there. I mean, that's one thing. And you can't convict anybody just because they were there. But a juror could reasonably draw from a year's association with these people and the number of visits a day and a week. Something was going on here. I mean, I don't know whether it's enough. Well, Your Honor, I think that's why it goes to this Court's holdings that the government can't merely stack inference upon inference upon inference and why the Court so closely focuses in those decisions on the defendant's knowledge of the billing in proximity to the billing that was occurring. And that evidence is simply wholly lacking here. While there are certain inferences that can be drawn, were the government asking to draw inferences from those initial inferences, knowledge of tests not performed to knowledge of billing Medicare? I mean, the defendant would go out and make examinations, perform tests, do whatever he was going to do. He would come back in and report to whom. Well, the evidence was merely that they would walk in, get handed a stack of forms of the patients they were to visit that day, go out, obtain the patient's information, the physical complaints about the patient, make recommendations, and that those forms were then handed to the office assistant for further review by the doctor's or physician's assistant at the office. And then the evidence by Ms. Agopian was that she would take that information and handle the billing and make the representations about what had or . . . Yes, there was not representations by these defendants about what had been performed. The only testimony as the government . . . . . . of any of their reporting that they didn't perform the tests, that they did or did not perform the tests. They just filled out the forms and gave them to her. Well, there was testimony that tests had not been performed, but not that they had represented they performed a test when they hadn't, with the debatable exception about the ultrasound where Ms. Agopian . . . that I mentioned before about Ms. Agopian saying that she ordered Mr. Umatong to perform an ultrasound. He said he did it, but she never got a test result back. But that only goes to show that Mr. Umatong didn't know the object of the conspiracy involved Ms. Agopian substantiating tests with test results. That's the only specific example of . . . What would he put on those forms? In other words, all of the forms that he would turn back in that day would indicate that he had done something. Well, the forms were mostly clerical information, reports of back pain and such, and then there would be checkmarks for recommendation of tests to be performed. But they needed authorization from a doctor, and the testimony is clear about that, that there was work left to be done by a reviewing doctor. And Dr. Segovia even testified that this is an abnormal in a medical practice, that oftentimes doctors are reviewing notes by nurses or physician's assistants and such. All right. Did Mr. Umatong ever see the same patient more than once? There's no evidence that he did. There was no evidence that he was involved in any follow-up visits. All right. Thank you, Your Honors. All right. Thank you, Counsel. Counsel for Mr. Gates, pronounce your last name for me. Cajun. Cajun. I was afraid to butcher it. Your court appointed, is that correct? All right. This panel and our court as a whole really appreciates the work of all our court appointed counsel and certainly your work in this case, the briefing and oral argument on behalf of your client. We thank you and we applaud you for continuing to take these cases. Thank you. All right. Thank you for the briefing.